**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**NACSO NON-PROFIT BUSINESS LEAGUE INC.,**

      **Plaintiff,**

v.

**CONSUMER FINANCIAL PROTECTION BUREAU,**

      **Defendant.**

**Case No.:**

**COMPLAINT FOR DECLARATORY RELIEF**

    Plaintiff, Nacso Non-Profit Business League Inc. ("NACSO"), by and through undersigned counsel, brings this action against Defendant, the Consumer Financial Protection Bureau ("CFPB" or "Defendant"), as a facial and applied challenge to an unconstitutional and a statutorily unauthorized, and thus unlawful, regulation infringing on the fully-protected speech of credit repair organizations. This Complaint seeks a declaratory judgment as to the invalidity and unenforceability of a provision of what is commonly referred to as the Telemarketing Sales Rule as defined and set forth below.

**I.    PRELIMINARY STATEMENT**

    NACSO is a non-profit national association that strives to educate its members, which include credit repair organizations, so they are able to provide their much needed and desired services to help consumers while supporting and facilitating the compliance with reasonable laws and regulations to safeguard those consumers. However, the CFPB recently has sought to enforce against NACSO's members an overreaching, unconstitutional, and inapplicable regulation contrary to law thereby making this lawsuit necessary. Credit repair organizations are governed by

1

the legislatively enacted Credit Repair Organizations Act.  Yet, the CFPB has recently sought to apply and to enforce a provision of a Telemarketing Sales Rule that is not promulgated under the Credit Repair Organizations Act, which rule prohibits NACSO's members from being paid for their services until *at least* six months after those services have been rendered. This arbitrary six-month waiting period eviscerates the ability of NACSO's members to be paid for work already performed and puts the full burden of the consumer's credit status on the credit repair organizations, long after the credit repair services were provided. This result is not only unfair and contrary to the legislatively enacted Credit Repair Organizations Act, but also contrary to law as the ability to create a "time and manner" restriction  is nowhere within the congressional mandate granting any agency authority to promulgate the six-month waiting period set forth in the Telemarketing Sales Rule in the first instance. Indeed, circumstances completely outside the control of the members of NACSO, such as the present Covid-19 crisis, unfortunately could negate the credit repair service results achieved by NACSO members for consumers in the same six (6) month window thereby impacting NACSO members' ability to be paid for services that they fully performed and that they are entitled to be paid.

## II.    INTRODUCTION

1.    This civil action seeks a declaratory judgment pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702 *et seq.* and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 to restrain Defendant from acting under the color of law to deprive credit repair organizations, including members of NACSO, of their constitutional rights secured by the First Amendment to the United States Constitution.

2.    Specifically, NACSO seeks judicial review of the prohibition on a credit repair organization to be able to request or receive payment for services it already rendered for a *minimum*

six-month period of time after those services are rendered as set forth in the Telemarketing Sales Rule, 16 C.F.R. § 310.4(a)(2)(ii) (the "TSR"), and a declaration that the TSR: (a) exceeds the statutory authority conferred by the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101 *et seq.* (the "Telemarketing Act"); (b) conflicts with the Credit Repair Organizations Acts, 15 U.S.C. §§ 1679 *et seq.* ("CROA"); and (c) is an illegal and unenforceable violation of the First Amendment rights of credit repair organizations that improperly impairs fully-protected speech because it is content-based and cannot withstand scrutiny.

3.      The CFPB has enforced, and continues to show that it intends to enforce, the TSR against credit repair organizations, including members of NACSO. Along these same lines, the CFPB is encouraging consumer reporting agencies to not investigate "disputes submitted by credit repair organizations and disputes they reasonably determine to be frivolous or irrelevant." *See* https://files.consumerfinance.gov/f/documents/cfpb_credit-reporting-policy-statement_cares-act_2020-04.pdf (last visited, May 7, 2020).

4.      In both instances, the CFPB continues to financially burden NACSO members based on the content of their speech, which reflects the CFPB's preference and attempts to unlawfully silence the speech of credit repair organizations in violation of the First Amendment.

## III.    PARTIES

5.      NACSO is a non-profit association of organizations within the credit repair industry which association is headquartered in Broward County, Florida and organized pursuant to §501(c)(6) of the Internal Revenue Code. NACSO provides education for its members, advocates industry standards and ethical business practices for the credit repair industry, and promotes compliance with applicable laws throughout the credit repair industry. In addition to face-to-face

contact with persons, NACSO members make calls to, and receive calls from, persons whose credit worthiness or credit standing may be improved by the services of NACSO members, respectively.

6.      The CFPB is an agency of the executive branch of the United States government responsible for, *inter alia*, "regulating the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491.

## IV.    JURISDICTION

7.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 and Article III of the Constitution.

8.      The TSR constitutes final agency action subject to judicial review under the Administrative Procedure Act, 6 U.S.C. §§ 702 *et seq.*

## V.    VENUE

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(e)(1) and 5 U.S.C. § 703 because NACSO is headquartered in this District and no real property is involved in this action.

## VI.    STANDING

10.     NACSO has Article III standing as an organization to bring suit on behalf of its members. *See Friends of the Earth v. Laidlaw Environmental. Servs. Inc.*, 528 U.S. 167, 181 (2000); *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Specifically:

(i)     NACSO's members provide services to individuals in an effort to improve such individuals' credit history, credit record, or credit rating (i.e., credit worthiness and credit standing) and are compensated for such services, and, thus, would have standing to sue in their own right to seek the declaratory relief sought herein as they are subject to Defendant's inapplicable enforcement of the TSR;

(ii)     the declaratory relief sought herein is germane to NACSO's purpose of educating its members as to the applicable law within the credit repair industry, advocating industry standards and ethical business practices for the credit repair industry, and promoting compliance with applicable laws throughout the credit repair industry; and

(iii)    the declaratory relief sought herein does not require the participation of NACSO's members.

## VII.   STATEMENT OF FACTS

11.     In 1914, Congress enacted the Federal Trade Commission Act that created and established the Federal Trade Commission ("FTC"). 15 U.S.C. §§ 41 *et seq.*

12.     Pursuant to the Federal Trade Commission Act, the FTC is authorized to prevent certain persons and entities from using "unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a).

13.     Congress limited the FTC's authority to make unfair and deceptive determinations in rulemaking proceedings by imposing special procedural and judicial review requirements for the FTC's conduct that exceed those otherwise contained in the Administrative Procedure Act. *See* 15 U.S.C. § 57a.

14.     The FTC is an agency of the executive branch of the United States government responsible for, *inter alia*, enforcing compliance with CROA. In 1994, Congress enacted the Telemarketing Act that that provides "consumers necessary protection from telemarketing deception and abuse." 15 U.S.C. § 6101(5).

15.     Towards this end, the Telephone Act authorized the FTC to prescribe rules and regulations prohibiting deceptive telemarketing acts or practices and other abusive telemarketing

acts or practices as set forth in the Telemarketing Act and enforcing compliance with such rules and regulations. 15 U.S.C. § 6102.

16.     The Telemarketing Act provides that such rules respecting "abusive telemarketing acts or practices" must include:

> (A) a requirement that telemarketers may not undertake a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy, (B) restrictions on the hours of the day and night when unsolicited telephone calls can be made to consumers, (C) a requirement that any person engaged in telemarketing for the sale of goods or service shall promptly and clearly disclose to the person receiving the call that the purpose of the call is to sell goods or services and make such other disclosures as the Commission deems appropriate, including the nature and price of the goods and services; and (D) a requirement that any person engaged in telemarketing for the solicitation of charitable contributions, donations, or gifts of money or any other thing of value, shall promptly and clearly disclose to the person receiving the call that the purpose of the call is to solicit charitable contributions, donations, or gifts, and make such other disclosures as the Commission considers appropriate, including the name and mailing address of the charitable organization on behalf of which the solicitation is made.

15 U.S.C. 6102(a)(3).

17.     Importantly and as it relates to the compensation for the sale of goods or services in the context of "abusive telemarketing acts or practices," the FTC was <u>not</u> given authority to regulate the time or manner in which a "person engaged in telemarketing" is so compensated, but rather was given the limited authority to regulate "disclosures…the Commission deems appropriate, including the nature and price of the goods and services." 15 U.S.C. § 6102 (a)(3).

18.     In response and pursuant to the authority granted by the Telemarketing Act, the FTC promulgated the TSR concerning "abusive telemarketing acts or practices." *See* 16 CFR § 310.4.

19.     The TSR states, in pertinent part:

> It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct: [r]equesting or receiving

payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until [t]he seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, **such report having been issued more than six months after the results were achieved**.

16 C.F.R. § 310.4(a)(2)(ii) (emphasis added).

20.     The FTC has not sought to enforce the TSR's six-month rule against credit repair organizations.

21.     Notwithstanding, the CFPB believes it is authorized to enforce the TSR against credit repair organizations pursuant to the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5301 *et seq. See* 12 U.S.C. § 5581(b)(5).

22.     Indeed only recently, and only after conflicting legislation has limited the CFPB's ability to enforce the TSR, the CFPB has sought to enforce the TSR in relation to certain members of NACSO.

23.     Specifically, less than a year after the TSR became effective, Congress passed the CROA legislation.

24.     CROA was enacted in 1996 with the express purposes of ensuring "that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services" and protecting "the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b).

25.     Importantly, CROA does <u>not</u> delegate rulemaking authority upon the FTC. *See* 15 U.S.C. §§ 1679 *et seq.*

26.     Instead, CROA simply permits the FTC to enforce the requirements or prohibitions of CROA. *See* 15 U.S.C. § 1679h.

27.     Congress' decision to not delegate rulemaking authority to the FTC reflects the congressional intent for CROA, as written, to be the final and decisive law concerning credit repair organizations, including the time and manner of their billing practices.

28.     This congressional intent is further reflected in the Consumer Financial Protection Act of 2010 that did <u>not</u> transfer the FTC's CROA enforcement authority to the CFPB. *See* 15 U.S.C. § 5581(b)(5).

29.     Indeed, as recently as November 7, 2019, members of Congress confirmed this intent by communicating their understanding to the CFPB that not only did "the Federal Trade Commission, which enforces CROA, instruct[] credit repair organizations (CROs) and consumers that **CROA is the law of the land with respect to billing regulations**, but also, "**with regard to CROs, the TSR is no longer operative**[.]" *See* Exhibit A (emphasis added).

30.     An explicit purpose of CROA is "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b)(2).

31.     Towards this end, CROA prohibits persons from, *inter alia*:

> (3) mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization; or engag[ing], directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or (4) any attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization.

15 U.S.C. §1679b.

32.     The term "credit repair organization" is defined by CROA, in pertinent part, to mean:

> any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purposes of (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i).

15 U.S.C. § 1679a(3)(A).

33.     As is evident by a comparison of CROA and the TSR, both the legislative regime of CROA and the TSR regulations appear to seek to similarly regulate the conduct of persons seeking compensation for improving a consumer's credit history, credit record, or credit rating in an attempt to prevent deceptive, misleading, and abusive behavior of such persons. *Compare* 15 U.S.C. 1679a(3)(A) *with* 16 C.F.R. § 310.4(a)(2)(ii).

34.     CROA—a federal statute codified by the democratically elected Congress—is broader than the TSR—a rule promulgated by appointed officials—in that CROA governs all credit repair organizations using *any* instrumentality of interstate commerce, which includes those engaging in telemarketing as well as those which do not engage in telemarketing.

35.     However, CROA and the TSR conflict concerning when a credit repair organization may charge or receive compensation for the performance of its services.

36.     Specifically, CROA states "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer **before such service is fully performed**." 15 U.S.C. § 1679b (emphasis added).

37.     Whereas, the TSR provides a credit repair organization cannot "request[] or receiv[e] payment of any fee or consideration for [its] goods or services…until [t]he [credit repair organization] has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, **such report having been issued more than six months after the results were achieved."** 16 CFR § 310.4(a)(2)(ii).

38.     Thus, a credit repair organization that is in full compliance with CROA—a federal statute passed by the democratically elected branches of government—may be deemed by the CFPB to nonetheless be in violation of the TSR—a rule promulgated by unelected officials—depending upon when the credit repair organization requests or receives compensation for its services.

39.     A violation of the TSR is subject to enforcement by the FTC as an unfair or deceptive act or practice, including monetary penalties per violation, and by the CFPB as an unfair, deceptive, or abusive act or practice, including monetary penalties per violation. 15 U.S.C. § 6102(c).

40.     Understandably, this conflict has created extreme confusion and angst among the members of NACSO which seek to adhere to applicable laws and regulations.

41.     The TSR is only applicable to credit repair organizations who communicate via telephone and request or receive payment for goods or services represented to improve a person's credit history, credit record, or credit rating, which includes the removal of derogatory information from a person's credit history.

42.     By requiring credit repair organizations, including members of NACSO, to wait *at least* 6 months to receive compensation for services rendered, the TSR has a chilling effect on the fully-protected speech of credit repair organizations, including members of NACSO, in violation of the First Amendment.

43.     Indeed and in addition to its conflict with CROA, the TSR's six-month rule that the CFPB seeks to enforce against members of NACSO exceeds the statutory rulemaking authority conferred by Congress in the Telemarketing Act and, as applied, infringes on the fully-protected

speech of the members of NACSO by imposing unconstitutional barriers that, in light of the monetary penalties associated with a violation of TSR, suppress their protected speech.

44.     The CFPB's disdain for and unlawful targeting of credit repair organizations is further reflected in the CFPB's recent instruction to consumer reporting agencies to not investigate "disputes submitted by credit repair organizations," which instruction, if followed, precludes credit repair organizations from providing their valuable services in the first instance—namely, to remove derogatory information from a consumer's credit report and/or to improve a consumer's credit history, credit record, or credit rating (i.e., credit worthiness and credit standing).

45.     There is an actual, justifiable controversy among the parties and a present need for a declaration as to the invalidity and unenforceability of the TSR.

46.     Unless this Court grants the declaratory relief sought herein, the constitutional rights of NACSO and its members will continue to be injured by CFPB and its unlawful enforcement of the TSR.

47.     Plaintiffs have performed all conditions precedent to bring this action or any said conditions have been satisfied, excused, or waived.

## COUNT 1

### (Unlawful Agency Action in Excess of Statutory Authority)

48.     NACSO incorporates by reference the allegations set forth in paragraphs 1 through 47, *supra*.

49.     The Telemarketing Act does not give the FTC or any agency, including the CFPB, authority to issue rules regulating the time or manner in which a person engaged in telemarketing deemed "abusive" by the TSR is compensated for the sale of such person's good or services.

50.     Instead, the Telemarketing Act gives the FTC the limited authority to issue the following rules concerning abusive telemarketing acts or practices:

(A) a requirement that telemarketers may not undertake a pattern of unsolicited telephone calls which the reasonable consumer would consider coercive or abusive of such consumer's right to privacy, (B) restrictions on the hours of the day and night when unsolicited telephone calls can be made to consumers, (C) a requirement that any person engaged in telemarketing for the sale of goods or service shall promptly and clearly disclose to the person receiving the call that the purpose of the call is to sell goods or services and make such other disclosures as the Commission deems appropriate, including the nature and price of the goods and services; and (D) a requirement that any person engaged in telemarketing for the solicitation of charitable contributions, donations, or gifts of money or any other thing of value, shall promptly and clearly disclose to the person receiving the call that the purpose of the call is to solicit charitable contributions, donations, or gifts, and make such other disclosures as the Commission considers appropriate, including the name and mailing address of the charitable organization on behalf of which the solicitation is made.

15 U.S.C. § 6102(a)(3).

51.     Contrary to the only authority provided by Congress, the TSR reflects the unauthorized determination that a credit repair organization which uses telephones in interstate commerce and requests or receives compensation from a person for services rendered prior to providing such person "documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, **such report having been issued more than six months after the results were achieved**," engages in abusive acts or practices. 16 CFR § 310.4(a)(2)(ii) (emphasis added).

52.     The promulgation of the TSR's six-month rule exceeds the rulemaking authority provided under the Telemarketing Act and does not permit or support an interpretation of the Telemarketing Act to permit time and manner restriction on the payment for services rendered by credit repair organizations, which includes members of NACSO.

53.     As such, the TSR's time and manner restriction on the payment for services rendered by credit repair organizations, including members of NACSO, *see* 16 CFR §

310.4(a)(2)(ii), exceeds the delegated statutory rulemaking authority within the meaning of 5 U.S.C. § 706(2)(C) and cannot be enforced by the CFPB.

54.     Notwithstanding, even if the rulemaking authority delegated by Congress to the FTC pursuant to the Telemarketing Act is somehow determined to be broad enough to encompass the TSR's regulation on the time or manner in which a credit repair organization can be compensated for its services, the subsequent enactment of CROA, which exclusively occupies the credit repair organization industry field by explicitly regulating such organizations, must trump such authority, broad or otherwise, of the FTC.

55.     This is particularly so given that Congress chose to enact regulations and prohibitions upon credit repair organizations at the federal level through the passage of CROA and, importantly, did not delegate rulemaking authority to the FTC or any agency, including the CFPB. Surely if Congress wanted to have the FTC or any agency interpret or promulgate rules concerning CROA, it would have delegated such authority.

56.     Instead, Congress chose to permit the FTC *only* to enforce CROA as written.

57.     While the TSR's six-month rule could perhaps have been valid at one point in time concerning credit repair organizations, the TSR lost its validity and applicability because any rulemaking authority the FTC or any agency, including the CFPB, may have had regarding credit repair organizations pursuant to the TSR was forfeited upon the enactment of CROA.

58.     CROA supersedes and invalidates the TSR's six-month rule concerning credit repair organizations.

59.     As a result, the TSR is unlawful and inapplicable to credit repair organizations already governed by the statutory scheme set forth in CROA.

## COUNT II
### (Unconstitutional Content-Based restriction on Protected Speech)

60.     NACSO incorporates by reference the allegations set forth in paragraphs 1 through 47, *supra*.

61.     The First Amendment prohibits discrimination as to the content of speech or the identity of the speaker. *Reed v. Town of Gilbert*, 576 U.S. 155, (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.")

62.     The TSR is based on the content of the speech, which includes the identity of the speaker. *U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 812 (2000).

63.     Content-based speech restrictions are subject to strict scrutiny. *Id.*, 529 at 813.

64.     Because the TSR regulates, indeed chills, speech based on its content, "it must be narrowly tailored to promote a compelling Government interest. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Id.* (internal citation omitted).

65.     Defendant bears the burden of demonstrating that the TSR is narrowly tailored to further a compelling interest which they are entitled to protect using the least restrictive means available. *See Secretary of the State of Md., v. Joseph H. Munson Co.,* 467 U.S. 947, 959-960 (1984); *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 636 (1980).

66.     TSR is <u>not</u> narrowly tailored to further a compelling government interest through the use of the least restrictive means available, as evidenced by Congress's passage of CROA that prohibits payments to credit repair organizations "before such service is fully performed." 15 U.S.C. § 1679b(b).

67. These crucial differences as to the timing of payment to credit repair organization for services rendered (i.e., "before such service is fully performed" v. "report having been issued more than six months after the results were achieved") underscore the intent of Congress when enacting the Telemarketing Act and CROA and the unlawful and excessive scope and application of the TSR regulation the CFPB seeks to enforce.

68. The TSR prohibits the credit repair organization industry, and *only* the credit repair organization industry, from requesting or receiving compensation for services for an arbitrary time period of *at least* 6 months *after* services are rendered. As applied, the TSR targets the credit repair organization industry and chills the fully-protected speech rights of those credit repair organizations, including members of NACSO, based upon the content of the communication—namely, "goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating."

69. Indeed, should the credit repair organization "represent[] to…improve a person's credit history, credit record, or credit rating" and accomplish just that, but 5 months later the consumer then independently damages his/her credit record through no fault of the credit repair organization thereby negating the "represented…improve[ment,]" such credit repair organization would never be compensated for its services despite accomplishing precisely what it represented it would accomplish on behalf of the consumer.

70. In such a situation, credit repair organizations are improperly targeted and, furthermore, could cease to exist, thus being unable to even communicate or assist consumers. As a result, the TSR, as applied, is "presumptively inconsistent with the First Amendment [because] it imposes a financial burden on speakers because of the content of their speech." *Simon v. Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 115 (1991).

71.     The TSR is "contrary to constitutional right, power, privilege or immunity." 5 U.S.C. § 706(2)(B).

72.     Accordingly, the TSR is unlawful.

### COUNT III
### (The TSR is Underinclusive)

73.     NACSO incorporates by reference the allegations set forth in paragraphs 1 through 47 and 60 through 72, *supra*.

74.     A law is underinclusive and thus not narrowly tailored "when it discriminates against some speakers but not others without a legitimate 'neutral justification' for doing so. Even when the government has a compelling interest for restricting speech, it may not seek to further that interest by creating arbitrary distinctions among the speakers that bear no 'reasonable fit' to the interest at hand. " *Nat'l Fed. of the Blind, v. F.T.C.*, 420 F.3d 331, 345 (4th Cir. 2005) (citing *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410-417 (1993)).

75.     An underinclusive law "raises serious doubt about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

76.     The TSR is underinclusive because it prohibits the credit repair organization industry, and *only* the credit repair organization industry, from requesting or receiving compensation for services for an arbitrary time period of *at least* 6 months *after* services are rendered.

77.     The speech of credit repair organizations, including members of NACSO, is no more harmful than other speech allowed by TSR that is not regulated as to time or manner of payment.

78.     There is no relation between any legitimate government interest upon which the TSR is predicated and the speech banned, muzzled, chilled, regulated, or allowed by the TSR.

79.     As such, the TSR, as an impermissible means of advancing any legitimate interest of the government, is unconstitutional.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Nacso Non-Profit Business League Inc., respectfully requests the following relief and judgment from this Court:

(a)     A declaration that the TSR violates the United States Constitution and is, thus, unenforceable;

(b)     A declaration that the promulgation of the TSR unlawfully exceeds the delegated statutory rulemaking authority under the Telemarketing Act, and conflicts and was superseded by CROA, which renders the TSR invalid and unlawful;

(c)     An order awarding Plaintiff, Nacso Non-Profit Business League Inc., any supplemental relief including, but not limited to, its costs and attorneys' fees incurred in bringing this action to the greatest extent permitted by applicable law; and

(d)     Any such other and further relief as this Court deems just and proper in favor of Plaintiff, Nacso Non-Profit Business League Inc.

Dated: May 21, 2020                    Respectfully submitted,

                                        */s/ Beth-Ann E. Krimsky*
                                        Beth-Ann E. Krimsky
                                        Florida Bar No. 968412
                                        Lawren A. Zann
                                        Florida Bar No. 42997
                                        GREENSPOON MARDER LLP
                                        200 E. Broward Blvd., Suite 1800
                                        Fort Lauderdale, FL 33301
                                        Tel: (954) 527-6296
                                        Fax: (954) 333-4027

17

# EXHIBIT A

# Congress of the United States
## Washington, DC 20515

November 7, 2019

Bryan A. Schneider
Associate Director
Division of Supervision, Enforcement and Fair Lending
Consumer Financial Protection Bureau
1700 G St. N.W
Washington, D.C. 20006

Associate Director Schneider,

Congratulations on your new role as the Consumer Financial Protection Bureau's (Bureau) Associate Director in the Division of Supervision, Enforcement and Fair Lending. You have accepted a very important responsibility at a critical time in the Bureau's history.

Congress passed the Credit Repair Organizations Act (CROA) in 1996, and since it's effective date the following year, CROA has regulated the activity of credit repair organizations. CROA made important strides to protect consumers, including a prohibition on consumer billing *prior to work being conducted* on a client's behalf. We understand the Federal Trade Commission, which enforces CROA, instructed credit repair organizations (CROs) and consumers that CROA is law of the land with respect to billing regulations.

It has come to our attention that the Bureau has recently assumed a new regulatory approach to credit repair organizations' billing practices through enforcement with no prior guidance given to the industry. It appears the Bureau now attempts to subject credit repair organizations to an interpretation of a single clause in Telemarketing Sales Rule (TSR), which was implemented via rulemaking process by the FTC and before Congress passed CROA. The Bureau's interpretation of the TSR would prohibit a credit repair company from billing its consumers for *six months after completion of work*, an extremely burdensome requirement for any industry.

These dueling mandates seem contradictory; with CROA's standard being the most recent and derived from congressional authority, one would assume with regard to CROs the TSR is no longer operative, but the Bureau's recent actions suggest, at least, confusion. Financial companies have a responsibility to abide by the law of the land. Regulators, too, have a responsibility to clearly articulate for the companies they regulate the legal standard by which they will be measured.

We expect the Bureau to provide American business with guidance, due process, and regulatory clarity. While the Bureau's policy development with respect CROs' billing requirements predated your arrival at the Bureau, we ask that you provide to us with specific examples of formal guidance provided by the Bureau to CROs that clearly articulates how a modern CRO operationally complies with the billing standard in the TSR and demonstrate that the billing standard in the TSR, not CROA, has been and is the controlling law of the land.

Thank you for your prompt attention to this matter, and we look forward to your response.

Sincerely,

Blaine Luetkemeyer
Member of Congress

Denver Lee Riggleman III
Member of Congress

Ted Budd
Member of Congress

Ann Wagner
Member of Congress